QUESTIONS PRESENTED AND CONCLUSIONS
ISSUE #1: If computer failures at the Year 2000 date change ("Y2K") cause a significant interruption of public services so as to endanger life or property or to disrupt the peace, can the governor order state and local governments to respond to protect public safety?
ANSWER #1: Yes. The same legal principles that ordinarily apply to disaster emergencies or breaches of the peace will apply to any situations caused by a Y2K computer failure. Therefore, the Colorado Disaster Emergency Act, § 24-32-2101-2115, 7 C.R.S. (1998), ("the Act") provides authority only to the governor or the appropriate local principal executive to declare a disaster, thereby triggering a wide array of actions under state and local plans. In this event, the sheriff would carry out the law enforcement duties called for in the applicable state or local plan.
ISSUE #2: Given the same situation, but absent a disaster emergency declaration, does a sheriff have authority beyond the power of arrest to direct the actions of citizens or commandeer and utilize private property?
ANSWER #2: No. Sheriffs may utilize their authority under §30-10-516 9, C.R.S. (1998) to "keep and preserve the peace in their respective counties," which they do by issuing summons and making arrests. Sheriffs have no other statutory authority to order or take actions of other kinds.
 ANALYSIS
Background Information
For the last several years, the private and public sectors have worked to prepare their computer systems to operate properly after the year 2000 date change ("Y2K"). Before the mid-1990's, computers processing dates used only the last two digits of a year. When the year 2000 arrives, calculations based on two digits alone will be incorrect. The remediation process involves identifying affected systems and embedded chips, rewriting the computer logic or replacing all two-digit fields with four-digit fields, and testing the systems.
The required remediation effort is extensive. Because many essential industries rely upon computers to deliver services, the public and private sectors are developing worst case contingency plans in the event remediation does not occur in time and computers fail. In these hypothetical cases, Y2K computer failures could cause widespread and prolonged power outages, telecommunication disruption, or sustained shortages of water, fuel, food or medicine. These shortages could in turn create public safety concerns. For example, combined with cold weather and snow, the loss of power and heat could endanger the health and well being of citizens. In addition, power outages could tempt some people to loot stores or use force to obtain warmth and shelter. If these hypothetical situations occur, citizens will call upon public officials to respond.
 DISCUSSION OF ISSUE 1
The Colorado Disaster Emergency Act Provides Authority for theGovernor to Act
Article IV, Section 2 of the Colorado constitution vests the "supreme executive power of the state" in the governor. "It is fundamental that the governor derives authority from the constitution and the laws enacted pursuant thereto." ColoradoPolytechnic College v. State Board, 173 Colo. 39, 476 P.2d 38,43 (1970).
The Colorado Disaster Emergency Act provides specific and comprehensive statutory authorization for government actions to respond to the Y2K worst case scenarios. The Act designates the governor as the primary decision-maker and provides him with broad authority to respond to disasters. Once invoked, the Act would control the question of what government official has authority to act in given circumstances.
When adopting the Act in 1992, the General Assembly set forth several purposes in § 24-32-2102(1) 7, C.R.S. (1998), including:
 a) Reduce vulnerability of people and communities of this state to damage, injury and loss of life and property resulting from natural catastrophes or catastrophes of human origin, civil disturbance, or hostile military or paramilitary action; . . .
 d) Clarify and strengthen the roles of the governor, state agencies, and local governments in prevention of, preparation for, response to, and recovery from disasters.
The Act provides that, "the governor is responsible for meeting the dangers to the state and people presented by disasters." §24-32-2104(1) 7, C.R.S. (1998). While the Act establishes a disaster emergency council composed of directors from various executive branch agencies to advise the governor, "nothing in the duties of the council shall be construed to limit the authority of the governor to act without the advice of the council when the situation calls for prompt and timely action when disaster threatens or exists." § 24-32-2104(3)(a), 7 C.R.S. (1998).
A "disaster" is broadly defined to mean the "occurrence or imminent threat of widespread or severe damage, injury, or loss of life or property resulting from any natural cause or cause of human origin, including but not limited to . . . civil disturbance . . ." § 24-32-2103(1), 7 C.R.S. (1998). By executive order or proclamation, the governor may declare a disaster emergency when he finds that such "has occurred or that this occurrence or threat thereof is imminent." § 24-32-2104(4), 7 C.R.S. (1998).
The executive order activates the relevant disaster plans applicable to the political subdivision or area in question,[1]
and is authority for the deployment of forces and the use of supplies and equipment. § 24-32-2104(5), 7 C.R.S. (1998). During the continuance of the disaster, the governor is the commander-in-chief of the organized militia and of "all other forces available for emergency duty." § 24-32-2104(6), 7 C.R.S. (1998). The governor also has broad powers to redirect state personnel and resources, commandeer and utilize private property (subject to later compensation), compel evacuation, prescribe travel routes and "suspend or limit the sale, dispensing, or transportation of alcoholic beverages, firearms, explosives or combustibles. . . ." § 24-32-2104(7), 7 C.R.S. (1998). Finally, the Act creates a fund from which the governor (with the concurrence of the council) may make monies available to supplement existing state and local financial resources. §24-32-2106(4), 7 C.R.S. (1998)
The Act does not add to or subtract from the sheriff's general law enforcement authority. The only specific role called out for sheriffs is that of coordinating all search and rescue operations within the sheriff's jurisdiction. § 24-32-2107(10), 7 C.R.S. (1998). The Law Enforcement System portion of the existing Colorado State Emergency Operations Plan provides that, "in disaster emergency situations law enforcement officials of affected jurisdictions direct all action toward enforcing the laws of the state and local jurisdiction." This portion of the Plan recognizes that while law enforcement activities remain under the control of the jurisdiction's chief law enforcement official, "[D]uring a state of disaster emergency, the Governor may assume the authority, within the disaster emergency area, to exercise all police power constitutionally vested in the state."
Absent such a declaration by the governor, the Act provides that a "local disaster may be declared only by the principal executive officer of a political subdivision," which then activates the response and recovery aspects of the local plans. § 24-32-2109, 7 C.R.S. (1998)
Because the Disaster Emergency Act provides specific authorization to the governor to act, he may utilize its powers and provisions to respond to any imminent or existing threat of injury to or loss of life or property. Since the definition of disaster includes "human origin," dangers caused by computer failures fall within the Act. Once the governor declares a disaster, the sheriff and other local law enforcement officials would follow the role specified in the state and local plans.
 DISCUSSION OF ISSUE 2
Absent a Declaration of a Disaster Emergency, the Sheriff ShouldUse Standard, Traditional Law Enforcement Powers in a Y2K-RelatedSituation
If neither the governor nor the local principal executive officer declares a disaster, and yet a Y2K computer failure causes a local disruption of services, leading to an actual or imminent breach of the peace, the sheriff may need to respond. However, even in these circumstances, a Y2K computer failure does not create new legal principles, but only a new set of facts to which standard legal principles and existing statutes apply. Therefore, sheriffs should act as they normally act, and use existing operating procedures to evaluate and respond to any Y2K-related breach of the peace.
Under common law, the sheriff has duties and powers to preserve peace and order, and to protect the community. "The office of sheriff reaches far back into English history, and was identified with the county concept brought to this country by the English colonists." 70 Am. Jur. 2d Sheriffs, Police and Constables § 2 (1987). Indeed, one court has stated that the "office of sheriff is one of the most ancient and important in Anglo-American Jurisprudence. Its origins pre-date the Magna Carta." WisconsinProfessional Police Ass'n v. County of Dane, 106 Wis.2d 303,316 N.W.2d 656, 658 (1982).
In Colorado, Article XIV, Section 8 of the state constitution, creates the office of sheriff, along with other county offices. Statutes define and authorize specific powers and duties of the sheriff. The peace keeping duties are codified in Colorado at § 30-10-516, 7 C.R.S. (1998) which provides in pertinent part:
 It is the duty of the sheriffs, undersheriffs, and deputies to keep and preserve the peace in their respective counties, and to quiet and suppress all affrays, riots and unlawful assemblies and insurrections. For that purpose, . . . they . . . may call to their aid such person of their county as they may deem necessary.
More specifically, § 18-1-901(3)(l)(II)(A), 6 C.R.S. (1998) defines the sheriff as a Peace Officer Level Ia, with the "authority to enforce all the laws of the state of Colorado while acting within the scope of the officer's authority and in the performance of the officer's duties." The sheriff typically enforces the laws by issuing summons or making arrests for violations of criminal statutes. See § 16-3-102, 6 C.R.S. (1998) (arrest by peace office) and § 16-3-110 (peace officer duties). While § 30-10-516, 9 C.R.S. (1998) authorizes the sheriff to "command aid" from others, this language derives from the traditional notion of "rounding up the posse." The codification of the "commanding aid" statute clearly contemplates aid in the making of an arrest and not otherwise. § 16-3-202, 6 C.R.S. (1998).
The sheriff's use of authority beyond the arrest power must be found in a specific statute. The Colorado courts have rarely interpreted the sheriff's inherent or implied powers. In Douglassv. Kelton, 199 Colo. 446, 610 P.2d 1067 (1980), the Routt County Sheriff (along with the Steamboat Springs Police Chief) refused to issue a concealed weapons permit to a business owner who transferred large sums of money, arguing that he had no authority to issue permits. The court noted that while the position of sheriff was created by the Colorado constitution, "the mere creation of an official position does not automatically vest that official with unlimited powers. The scope of his power and authority is limited to that inherent in the office. All other powers must be derived from legislation." Id. at 1068. The court found that a sheriff could fully perform his functions without issuing concealed weapons permits. Therefore, the power to issue permits was not inherent, but must be legislatively enacted. Because that legislative direction did not exist at that time, the court held that the sheriff acted properly to refuse the permit.
In People v. Buckallew, 848 P.2d 904 (1993), the court further refined the test for determining a sheriff's implied powers. In that case, the Pueblo County Sheriff appealed a felony conviction for issuing a false certificate, stating that an individual was a deputy entitled to carry a certain kind of firearm. In fact, the individual was not a deputy. Buckallew argued that a sheriff was not "authorized by law" to issue certificates, and therefore, the terms of the criminal statute did not apply to him. The Court stated:
 Although a sheriff's authority is generally created by legislative enactment, a sheriff also has those implied powers, which are reasonably necessary to execute those express powers. [citing Douglass.] The test for determining whether a power is implicit within a sheriff's express authority is whether or not the sheriff can fully perform his functions without the implied power. Id. at 908.
The court found that a sheriff is statutorily required to appoint deputies in writing, and therefore, issuing certificates was an implied power. Thus, the criminal statute applied.
In Douglass, the court refused to extend a sheriff's authority absent a specific statute, and in Buckallew, the court found an implied power only on the basis of another statute giving express authority to the sheriff. In the Y2K scenario, no statute authorizes the sheriff to take sweeping actions such as directing the actions of private citizens or commandeering private property for use on behalf of the public. The Disaster Emergency Act reserves those powers to the governor or the appropriate local principal executive.
Therefore, if the electricity goes off due to Y2K related computer failures by utility companies, and looting of businesses occurs within a sheriff's jurisdiction, the sheriff clearly has the power in his/her jurisdiction, to arrest and quell any such disturbance. The same would be true if one group of citizens unlawfully or forcibly entered onto another's property and took an electric generator without the owner's permission. In that case, arrest for theft or trespass may be appropriate.
However, the sheriff could not commandeer the use of an electricity generator and employ it to provide electricity to other citizens. To do so, under the Buckallew test, the sheriff would have to demonstrate that he could not have "fully performed" his peace keeping functions in that situation without the use of that action, and therefore, his power to act was implied. The sheriff would have to justify his actions based on the facts of each situation, and after the actions have occurred. Therefore, the sheriff is taking a legal risk when relying on a later justification of implied powers. By contrast, the use of traditional arrest powers is more appropriate and well defined.
 CONCLUSION
When the Year 2000 arrives, if computer failures cause imminent danger to loss of life or property, the governor may invoke the Colorado Disaster Emergency Act, and assume broad powers to respond. In the absence of such a declaration, the sheriff may respond to keep the peace, but should only use the arrest power to do so.
Issued this 8th day of September, 1999.
KEN SALAZAR Attorney General
RENNY FAGAN, 11262* Deputy Attorney General Business and Licensing Section 1525 Sherman Street, 5th Floor Denver, Colorado 80203
[1] To prepare for and respond to disasters, the Act requires local and interjurisdictional disaster agencies and plans. The local agency director is appointed by the chief executive officer or governing body of the local jurisdiction. § 24-32-2107(4), 7 (1998). The Act creates the Office of Emergency Management in the Department of Local Affairs to develop a state plan and to assist local planning. § 24-32-2105, 7 C.R.S. (1998).